Filed 7/29/22  In re R.R. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re R.R., a Person Coming Under the Juvenile Court Law. | B310550 (Los Angeles County Super. Ct. No. YJ40134) |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> R.R., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Christopher J. Smith, Judge. Affirmed.

Mary Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.

_____

R.R. challenges a dispositional order committing him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ) for a 30-month maximum period of confinement.[1]  R.R. contends the juvenile court abused its discretion, because there was no substantial evidence that a less restrictive placement would be inappropriate or ineffective.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 6, 2019, the Los Angeles County District Attorney filed a juvenile wardship petition alleging R.R. came under Welfare and Institutions Code section 602, because he committed the following offenses, all felonies involving a child under the age of 14:  aggravated sexual assault of a child (sodomy) (count 1; Pen. Code, §§ 269, subd. (a)(3), 286, subds. (c)(2), (c)(3) & (d)); sodomy by use of force (count 2; Pen. Code, § 286, subd. (c)(2)(B)); aggravated sexual assault of a child (sexual penetration) (count 3; Pen. Code, §§ 269, subd. (a)(5),

---

[1] At the same disposition hearing, the court also ordered R.R.'s younger brother, A.R., committed to a 30-month maximum period of confinement in DJJ custody.  A.R. filed a separate notice of appeal, and we issue a separate opinion (B310645) deciding A.R.'s appeal.

289, subd. (a)); sexual penetration by use of force (count 4; Pen. Code, § 289, subd. (a)(1)(B)); and continuous sexual abuse (count 5; Pen. Code, § 288.5, subd. (a)).[2] R.R. was initially detained in county jail, and later placed in the probation department's Community Detention Program (CDP).

Viewed in accordance with the usual rules on appeal (*In re Dennis B.* (1976) 18 Cal.3d 687), the evidence established that R.R. sexually assaulted S.P. twelve to fifteen times over a two-year period, starting when S.P. was six or seven years old. R.R. and his family (younger brother A.R., mother, and stepfather) lived next door to S.P.'s family for many years. The two families were very close, and R.R.'s mother regularly babysat S.P. from infancy. The abuse came to light in November 2018, when S.P. told her older sisters, and S.P.'s mother contacted the police.

In a report filed June 25, 2019, probation officer Whitney Hoffman recommended that R.R. be removed from home and placed into DJJ custody. The recommendation was premised on R.R.'s age (18 at the time) and the severity of the alleged offenses. According to the report, the DJJ "will offer intensive sex offenders treatment program, psychological counseling, college courses, job training, and a host of tools that will help [R.R.] transition back into the community and become a productive citizen."

On July 24, 2019, the court ordered R.R. detained at home under CDP, with specified restrictions, including remaining inside the home, no visitors, no cell phone, no internet other than for school, and no social media use. The CDP officer was

---

[2] Further statutory references are to the Welfare and Institutions Code unless stated otherwise.

ordered to determine whether counseling, community service and other activities were to commence, continue, or cease while R.R. was on CDP.

The CDP probation officer, Philip Mikhael, reported that R.R.'s participation in CDP was positive. R.R. participated in a group-based sex offenders counseling program at Ness Counseling Center for over a year. Probation officer Hoffman, who was later replaced by Aaron Estrada, continued to recommend sending R.R. to DJJ. In two of the last three reports, probation officer Estrada simply recommended that R.R. remain on house arrest until disposition.

On October 15, 2020, R.R. admitted to the first count of the petition filed against him, and the court sustained that count and dismissed all the others. At the disposition hearing, the prosecution played the videorecorded interviews of S.P., A.R., and R.R., and entered the DVDs and transcripts of those interviews into evidence. S.P's family members provided victim impact testimony. S.P.'s therapist also testified and read a portion of S.P.'s trauma narrative.

The court heard testimony from Dr. Krys Hunter, senior supervising psychologist at DJJ's Sex Behavior Treatment Program and Michael Farmer, a parole agent who testified about the process for determining DJJ projected release dates and parole board hearings. Dr. Dennis Brown, the director of Ness Counseling Center, testified about the Ness Counseling Center's programs and the extent to which R.R. and his younger brother, A.R., had participated.

At the conclusion of argument, the juvenile court ordered R.R. and A.R. committed to the DJJ for a maximum confinement term of 30 months. The court noted that "this is probably one of

4

the most egregious sexual conduct cases I've had since I've been on the bench as a juvenile court officer." Acknowledging the brothers' positive behavior on CDP, the court emphasized that they needed a comprehensive level of treatment, and that DJJ was the most suitable place for both of them.

## DISCUSSION

*Summary of Applicable Law*

When exercising its discretion on the proper disposition of a minor adjudged to be a ward under section 602, the juvenile court considers a broad range of information. The record must be viewed in light of the purposes of juvenile law. (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 5.) Those purposes include rehabilitation, treatment, guidance, punishment as a rehabilitative tool, and protection of the public. (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576 (*Teofilio A.*).) The court considers a probation officer's report and any other relevant and material evidence that may be offered, including statements by the victim and, for victims who are minors, the victim's parents. (§ 706.) The court must take into account the circumstances and gravity of the offense committed by the minor, as well as the minor's age and previous delinquency history. (§ 725.5.) The court may also consider the need to hold the minor accountable for his or her actions. (§ 202, subd. (b); *In re N.C.* (2019) 39 Cal.App.5th 81, 89 [court properly considered "the role punishment should have in minor's rehabilitation given the seriousness of his offense and his tendency to succumb to the negative influences of peers"].)

"One of the primary objectives of juvenile court law is

5

rehabilitation, and the statutory scheme contemplates a progressively more restrictive and punitive series of dispositions starting with home placement . . . and progressing to . . . placement at the DJJ." (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250; see also *In re N.C., supra,* 39 Cal.App.5th at pp. 85–86.) "Although the DJJ is normally a placement of last resort, there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been attempted." (*Ibid*.) Courts do not necessarily abuse their discretion in ordering a juvenile to the most restrictive placement before other options have been tried. (*In re Eddie M.* (2003) 31 Cal.4th 480, 507.) It is error, however, for the juvenile court to fail to consider less restrictive alternatives to a DJJ commitment. (*Teofilio A., supra,* 210 Cal.App.3d at p. 577.) Commitment to the most restrictive placement, such as DJJ, is permissible so long as there is substantial evidence demonstrating "a probable benefit to the minor from a DJJ commitment and of the inappropriateness or ineffectiveness of the proposed less restrictive alternatives." (*In re N.C., supra,* at p. 86 [affirming order committing first time offending minor to a maximum of nine years in DJJ after minor admitted one count of forcible oral copulation and one count of sexual battery of an intoxicated 17 year old high school student]; *In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.)

We review a commitment order for abuse of discretion, and find an abuse of discretion when necessary factual findings are not supported by substantial evidence. (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 908.) In our review of the appellate record, we draw all reasonable inferences in favor of the juvenile court's order. (*In re Angela M., supra,* 111 Cal.App.4th at p. 1396.) "[W]e consider whether substantial evidence supports the

juvenile court's commitment order consistent with the purpose of the juvenile court law. [Citations.] Substantial evidence, in turn, 'must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citation.]" (*In re Miguel C., supra,* 69 Cal.App.5th at p. 908.)

*No Abuse of Discretion, In Light of Substantial Evidence Supporting Court's Decision*

R.R. contends the court abused its discretion by relying solely on R.R.'s age and the severity of the offending conduct in deciding to commit R.R. to the DJJ. We disagree. While it is true that the court commented on R.R.'s age and the seriousness of the offenses when making its dispositional order, there is no support for R.R.'s argument that the court ignored all other evidence, focusing solely on those two factors. As we explain below, the record evidence supports the two findings necessary for a proper exercise of discretion: that the placement is of probable benefit, and that the proposed less restrictive alternative is ineffective or inappropriate. (*In re N.C., supra,* 39 Cal.App.5th at p. 86; *In re Calvin S.* (2016) 5 Cal.App.5th 522, 528.)

1.  Probable Benefit

Although R.R. does not contest, on appeal, that a DJJ commitment would provide him with a probable benefit, we nevertheless discuss that benefit as significant background to the juvenile court's consideration of less restrictive alternatives. Dr.

7

Hunter testified that the DJJ's Sex Behavior Treatment Program (SBTP) is certified by the California Sex Offender Management Board (CASOMB).[3] Dr. Hunter gave details about the SBTP, supported by a publication describing the program. The DJJ operates two facilities with SBTP, which is a therapeutic living unit devoted to the comprehensive treatment of resident juvenile sex offenders. During the first 30 to 45 days in the program, juveniles are in an orientation unit, completing a comprehensive SBTP assessment, resulting in an initial individual treatment plan. The assessments are carried out by psychologists, social workers, and other staff; the assessments look for strengths, weaknesses, risk levels, trauma history, and other factors to outline individual dynamic risks, treatment objectives for progress in the program, and objectives for successful completion of the SBTP. After orientation, juveniles in the SBTP program live in a dormitory-style setting, attend school, and participate in a comprehensive mix of "individual and group therapy, psycho-educational resource groups, journals and homework, group therapeutic exercises, biblio-therapy, video therapy, family counseling, family forums, plant and pet care, and therapeutic recreation and leisure activities." Participants in the program move through seven stages, starting with understanding and taking responsibility for their past and current behaviors; learning healthy ways to manage thoughts, feelings and behaviors; demonstrating progress in making positive behavioral changes; and preparing for re-entry into the community.

---

[3] The Board reviews programs and requires that treating staff have at least 30 hours of training, and to continue receiving training requirements to maintain certification.

2.    Less Restrictive Programs Ineffective or
      Inappropriate

R.R. contends that the juvenile court did not give adequate consideration to less restrictive alternatives, which R.R. claims were appropriate for him. As part of this contention, R.R. also argues there is no substantial evidence that the SBTP is "superior" to the proposed less restrictive alternatives. With respect to R.R.'s additional claim that the DJJ program was not shown to be "superior" to the alternatives, that is not what the law requires.

R.R. points to his successful participation in group therapy at the Ness Counseling Center, a community-based treatment program, arguing that there was insufficient evidence that the alternative of "home on probation" with a requirement of one year of intensive individual counseling was either ineffective or inappropriate. R.R.'s argument fails, however, to give consideration to the countervailing record evidence and credibility determinations that support the juvenile court's determination that the proposed less restrictive alternative was ineffective or inappropriate for R.R. in light of his age and the seriousness of the offense. (See *In re Juan G.* (2003) 112 Cal.App.4th 1, 6 ["The function of an appellate court is not to reweigh the evidence and substitute its judgment for that of the juvenile court"].)

Dr. Brown testified that R.R. had gained insight and matured tremendously through his participation in group therapy sessions for more than 52-weeks. However, cross-examination revealed Dr. Brown to be ill-informed, biased, or both. Dr. Hunter explained that youth sex offenders are more

9

amenable to treatment than adults, and treatment approaches are substantially different for adolescent sex offenders, compared to adult sex offenders. However, Dr. Brown testified that R.R. was placed in an adult group because he was already 18 when he started. Dr. Brown acknowledged that the center's typical sex offender clients are adults in the justice system for "viewing child porno, exposing themselves, driving around trying to solicit women and what have you." When a client first comes to the Ness Counseling Center for services, the center conducts an assessment, and adjusts what services the person would need, so a person who is "high risk" is not placed in a regular group. He acknowledged that group therapy would not be appropriate for a high risk offender, including someone who had engaged in repeated assaults of a child over a two-year period. This concession undermined Dr. Brown's opinion of an appropriate program for R.R., as Dr. Brown had not been provided with the video of R.R.'s interview, and mistakenly believed that R.R. had self-disclosed and turned himself in.

Dr. Brown also agreed that treatment in the SBTP at DJJ would be consistent with the aims of treatment at the Ness Counseling Center. Although Dr. Brown expressed a concern that DJJ was too punitive, as it kept youth in a locked environment, he conceded he had not visited DJJ, and had never spoken to anyone who spent time there. He was unaware that the SBTP is a dormitory, not individual cells like a prison, and that it included vocational and work training, as well as education. He agreed that R.R. would benefit from more comprehensive therapy several days a week.

Dr. Brown testified that the Ness Counseling Center could try to provide individual counseling for R.R. While there is no

evidence in the record about whether the Ness Counseling Center is a non-profit or for-profit organization, Dr. Brown was one of just two certified therapists at the Ness Counseling Center. Two of his sons worked at the center, providing services like monitored visits, child exchanges, fingerprinting, and drug testing. The group therapy sessions were supervised by the two therapists, but were often run by the 12 to 13 interns receiving training at the center. These facts support a reasonable inference that individual counseling at the Ness Counseling Center would not be effective at addressing R.R.'s more complex needs.

The court took judicial notice of a November 2020 psychological evaluation by Dr. Collister, who acknowledged the "group work" that R.R. had already engaged in, and recommended a one-year course of psychotherapy relating to his own history of prior traumas and psychodynamic conflicts. Dr. Collister's evaluation and recommendation supports an inference that the Ness Counseling Center's group therapy had already fallen short of R.R.'s individual needs. In recommending a course of specific individual psychotherapy, Dr. Collister noted: "It is my opinion that the group work [R.R.] has done for sexual offenders is just that, specifically focusing on sexual aspects relating to the offenses, and not specifically psychotherapy relating to his own history of traumas and psychodynamic conflicts."

Both the probation department and Dr. Hunter opined that the best and most comprehensive sex offender treatment program was available through the SBTP. Dr. Hunter testified that community-based treatment is less effective because the individuals remain in the environment that fostered the

11

offending behavior or attitude.[4]  In contrast, at DJJ "they are getting 24/7 treatment modality, and they are separated from those communities and the environment that fostered the criminal attitude to begin with."  Dr. Hunter testified that the SBTP can offer additional and continuing benefits, even to a youth who has benefited from prior counseling.  The program can tailor its programming to the youth's individual needs.  The record supports that programs less restrictive than commitment to DJJ would not be effective or appropriate for R.R.

3.    The Court's Reliance on R.R.'s Age and Severity of the Offending Conduct was Not Improper

R.R. argues that his demonstrated progress in CDP over an extended period of time and the court's failure to order an updated probation report shows that the juvenile court improperly relied solely on his age and the severity of the offense in deciding to commit him to DJJ.  The juvenile court's statements when announcing the disposition, including mentioning R.R.'s age and the seriousness of the offenses, do not establish an abuse of discretion.

---

[4] In addressing return to the environment, R.R. argues that, to the extent his offending conduct was tied to proximity to the victim, his family had moved and were no longer neighbors with S.P. and her family.  Although accurate, the argument only addresses one aspect of the environment in which R.R. committed his offenses; the movement of his family away from the victim does not address the extent to which R.R.'s own family dynamics may have played a role in his conduct.  Dr. Collister mentions abuse by R.R.'s step-father, and the fact that R.R.'s mother treated her three sons differently, at times disfavoring R.R.

12

The record evidence supports using R.R.'s age as a factor in deciding whether a less restrictive alternative was appropriate. At the Ness Counseling Center, R.R. participated in an adult group, not an adolescent group, a choice premised on his age. However, as Dr. Hunter explained, adolescent sex offenders are more amenable to treatment than adult offenders. The fact that the Ness Counseling Center placed R.R. in an adult group may therefore have been a factor in the court deciding that the comprehensive treatment available at SBTP was preferable to less restrictive community-based options, which might not have suitable programming for someone who was an adolescent at the time of the offending conduct, but was an adult at disposition.

Implicit in R.R.'s argument that the court erred by failing to order an updated probation report is an assumption that the juvenile court is precluded from focusing on punishment rather than on rehabilitation.[5] However, at disposition, the court may permissibly consider the need to hold the minor accountable for his or her actions, and the role of punishment as a rehabilitative tool. (§ 202, subd. (b); *In re N.C., supra,* 39 Cal.App.5th at p. 89 [court properly considered "the role punishment should have in minor's rehabilitation given the seriousness of his offense and his tendency to succumb to the negative influence of his peers"]; (*Teofilio A., supra,* 210 Cal.App.3d at p. 576.)

---

[5] The appellant's opening brief offers a number of criticisms around the probation department's duty to prepare a probation report and the court's duty to consider the report. Ultimately, however, because a probation report appears in the record, no party requested a supplemental report, and the recommendation is merely advisory and not binding, we do not respond to those criticisms.

13

R.R.'s critique of the court's commitment order does not negate the fact that there is substantial evidence in support of the court's decision, and evidence that other less restrictive programs would be ineffective or inappropriate. Our role on appeal is to determine whether the juvenile court's order is reasonably grounded in the record, not to reweigh the evidence in the record. (See *In re Alejandro G.* (2012) 205 Cal.App.4th 472, 480 [the fact that multiple experts had a different opinion than the court does not prove a lack of substantial evidence to support the court's ultimate finding].)

The court's rulings and questions throughout the disposition hearing demonstrate that it was aware of the scope of evidence to be considered, as well as the purpose of the juvenile court law. For example, the court overruled objections to victim impact testimony. The court questioned Dr. Hunter about the differences between SBTP and community based programs. Parole agent Farmer testified about the length of a DJJ commitment time needed for a minor to complete the SBTP program, affirming that a two-and-a-half to three year commitment would permit a youth to complete SBTP. Part of R.R.'s argument is that he was likely to complete the SBTP program early and would be housed with "youths who had committed all kinds of offenses." However, the length of R.R.'s term demonstrates that the purpose of the sentence was focused on rehabilitation, not punishment. (Compare, *In re N.C., supra,* 39 Cal.App.5th at p. 86 [nine-year maximum confinement].)

R.R.'s participation in group counseling and positive probation reports for close to a year are positive factors that the court considered in reaching its disposition order. It was not an

14

abuse of discretion to conclude that a CASOMB-certified program other than DJJ would be inappropriate.

## DISPOSITION

The juvenile court's January 15, 2021 dispositional order committing R.R. to the Division of Juvenile Justice for a maximum term of confinement of 30 months is affirmed.

MOOR, J.

We concur:

RUBIN, P. J.

KIM, J.

15